J-S38016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: E.A.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1194 WDA 2021 |

Appeal from the Decree Dated September 3, 2021
In the Court of Common Pleas of Warren County Orphans' Court at
No(s): A.N. No. 3 of 2021

| | | |
|---|---|---|
| IN RE: ADOPTION OF: E.L.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1195 WDA 2021 |

Appeal from the Decree Entered September 7, 2021
In the Court of Common Pleas of Warren County Orphans' Court at
No(s): A.N. No. 3 of 2021

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.J.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1196 WDA 2021 |

Appeal from the Decree Entered September 7, 2021
In the Court of Common Pleas of Warren County Civil Division at No(s):
A.N. No. 3 of 2021

| IN RE: ADOPTION OF: K.V.K. | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1197 WDA 2021 |

Appeal from the Decree Entered September 7, 2021
In the Court of Common Pleas of Warren County Orphans' Court at
No(s):  A.N. No. 3 of 2021

BEFORE:   BENDER, P.J.E., DUBOW, J., and COLINS, J.*

MEMORANDUM BY DUBOW, J.:                    **FEBRUARY 4, 2022**

P.K. ("Father") appeals from the Decree entered on September 7, 2021, in the Court of Common Pleas of Warren County, involuntarily terminating his parental rights to his four minor children: K.V.K., (born February 2010), K.J.K., (born February 2013), E.A.K., (born December 2014), and E.L.K. (born February 2017) (collectively, "Children").  After careful review, we affirm.

**Factual and Procedural History**

We glean the relevant facts and procedural history from the Orphans' Court's Memorandum Opinion and the certified record. Father and Mother divorced on March 7, 2019. Pursuant to a September 2018 *interim* custody order, Mother had primary physical custody and Father partial physical custody for six hours on alternating Sundays, supervised by Children's

_____

* Retired Senior Judge assigned to the Superior Court.

paternal grandparents at their home. The paternal grandparents transported Children to and from their house for the visits. Father last visited with Children in September 2019.

S.Y., ("Stepfather"), who knew Mother most of his life, married Mother on October 10, 2019. N.T., 9/3/21, at 12, 14. Prior to their marriage, Stepfather cohabited with Mother for approximately one year. *Id.* at 14-15. Stepfather has known the Children their entire lives. Mother was diagnosed with terminal cancer early in their romantic relationship. Mother obtained sole legal custody of Children in November 2019.

On February 22, 2021, Stepfather filed a petition for the involuntary termination of Father's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). Mother died on May 5, 2021. Children remained with Stepfather after her death.

On September 3, 2021, the court held an evidentiary hearing.[1] By the date of the termination hearing, Father had not seen or communicated with Children for one and one-half years.[2]

Father arrived late during Stepfather's testimony. N.T., 9/2/21, at 18. Upon his arrival, the court observed that Father was "possibly impaired."

---

[1] Counsel represented Father during the termination proceeding. The Children's guardian *ad litem* ("GAL") represented Children after informing the court there was no conflict between the Children's best interests and their legal interests. Orphans' Court Opinion, 10/5/21, at 2; N.T., 9/3/21, at 152.

[2] *Id.* at 22, 73.

Orphans' Court Opinion, 10/5/21, at 2. When the court inquired what was in his system, Father answered, "As far as I know Suboxone." N.T., 9/3/21, at 19.

Stepfather testified that, during his marriage to Mother, he shared parenting duties with her. He stated that, after Father started exercising supervised custody under the September 2018 *interim* custody order, Father expressed interest in increasing his custody of Children.[3] Stepfather stated that he and Mother met with Father to discuss his request, and Mother told Father that, "before I'm willing to venture into this, I would like a couple things from you. I would like you to be accountable to make more phone calls. . . ." *N.T.*, 9/3/21, at 21. Stepfather explained that "at that time, the one big thing was making more phone calls to Children, and in doing so [Mother] was willing to, you know, modify the original documents." *Id.* Stepfather testified that "when we left that day, everything at that point changed. There w[ere] no more phone calls [from Father] and, in fact, everything changed in a big way, even from visitation, showing up, *et cetera*." *Id.*

Stepfather further testified that since Mother's death, he has been Children's sole caretaker. He testified that he wants to adopt Children, with whom he shares a parental bond.[4]

---

[3] N.T., 9/3/21, at 20.

[4] *Id.* at 27, 44-45.

K.K., Father's then 18-year-old child who graduated from high school in Spring 2021, testified that when she participated with her siblings in the supervised visits with Father, only "[a] few times, not many . . ." did Father engage and interact with them during the visits. N.T., 9/3/21, at 75, 164. She further testified that, instead of interacting, "[t]here were a few times when [Father] would sleep or stuff like that." *Id.* at 87. K.K. stated that there were "a few times" when Father and her grandparents "went places" with them, such as on a bike ride or to the park. *Id.* at 88. K.K. also testified, however, that Father failed to attend supervised visits "[m]ultiple times, more than I can count." *Id.* at 82. She further explained that "before visit[s] stopped[,] I want to say maybe the last few months[,] he wasn't present for those visits." *Id.* at 87.

Following Stepfather's case in chief, the court directed Father to submit to a urine screen. Following a recess, the court resumed the hearing, noting that Father had tested positive for buprenorphine, methamphetamine, and amphetamines. *Id.* at 93.

Father testified on his own behalf and acknowledged, *inter alia*, that he has not performed any parental duties since September 2019. *Id*. at 136. He also testified regarding his drug addiction issues and blamed his lack of involvement in some custody proceedings and his voluntary cessation of supervised visits with his Children on Children's Mother and his parents. *See generally id.,* at 93-139. Paternal Grandfather testified that he believed Father

to be a good parent based on his observations during Father's supervised visits. *Id*. at 143.

At the conclusion of testimony, the parties' counsel presented closing arguments. The GAL advocated for the termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

The Orphans' court set forth its findings of fact and conclusions of law on the record in open court, concluding that Stepfather had met his burden of proof and that terminating Father's parental rights would be in the best interests of Children. *See id.*, at 158-176. The court entered its written Decree on September 7, 2021, involuntarily terminating Father's parental rights to the four minor children pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Father timely appealed and complied with Pa.R.A.P. 1925(a)(2)(i) and (b). The Orphans' Court filed a Rule 1925(a) Opinion. This Court consolidated the appeals *sua sponte*.

**Issues Raised**

Father presents two issues for our review:

1. Did the [Orphans'] [C]ourt properly rule that termination of [Father]'s parental rights to [C]hildren was warranted, in terms of establishing by clear and convincing evidence that the elements of 23 Pa.C.S.A. § 2511(a)(1) were met?

2. Did the [Orphans'] [C]ourt properly rule that termination of [Father]'s parental rights to [C]hildren was warranted, in consideration of the developmental, physical and emotional needs and welfare of [C]hildren, as required [by] 23 Pa.C.S.A. § 2511(b)?

Father's Br. at 4.

**Standard and Scope of Review**

When reviewing a Decree involuntarily terminating parental rights, this Court must accept the findings of fact and credibility determinations of the Orphans' Court if the record supports them. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). If the record supports the court's factual findings, we must then consider whether the court committed an error of law or abused its discretion. ***Id.*** Where the competent record evidence supports the court's findings, we must affirm the termination Decree even if the record could support a different result. ***In re Adoption of Atencio****,* 650 A.2d 1064, 1066 (Pa. 1994).

The Orphans' Court "is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73–74 (Pa. Super. 2004) (citations omitted). We defer to the Orphans' Court because it often has "first-hand observations of the parties spanning multiple hearings." ***In re T.S.M.***, ***supra*** at 267 (citations and quotation marks omitted). It is important to remain mindful that courts "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time . . . in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care." ***In re Adoption of R.J.S.,*** 901 A.2d 502, 513 (Pa. Super. 2006) (emphasis in original; citations omitted).

**Legal Analysis**

The Adoption Act requires that the Orphans' Court conduct a bifurcated analysis when considering a petition to terminate parental rights involuntarily. *See* 23 Pa.C.S. § 2511(a) and (b). The court first focuses on the conduct of the parent, and if the party seeking termination presents clear and convincing evidence that the parent's conduct meets one of the grounds for termination set forth in Section 2511(a), the court must then analyze whether termination of parental rights will serve the needs and welfare of the child pursuant to Section 2511(b). The court must examine the existence of the child's bond with his or her parent, if any, and the potential effect on the child of severing that bond. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007).

**Termination Pursuant to Section 2511(a)(1)**

Father asserts that Stepfather failed to provide clear and convincing evidence to terminate his parental rights under 2511(a)(1). Pursuant to Section 2511(a)(1), the trial court may terminate parental rights if the Petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, "the court must consider the whole history of a given case and not mechanically apply the six-month

statutory provision." *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008) (citation omitted).

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child. *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). "These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child." *Id*. Rather, "affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child." *Id*. Thus, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id,.* (citation omitted). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* (citations omitted). Simply, "adequate parenting requires **action** as well as **intent**." *In re J.W.*, 578 A.2d 952, 959 (Pa. Super. 1990) (emphasis in original).

The Orphans' Court here concluded after the hearing that Father's conduct warranted the termination of his parental rights under Section 2511(a)(1). The court observed that Father is "not involved in any way, shape or form in their schooling, in their medical care, in their day-to-day care. That

has all fallen to the mother and [Stepfather] at the time that the mother was still living, and now to [Stepfather] solely[.] … [Father] has not been involved in any respect . . . in quite a period of time." N.T. at 156-57. The court concluded:

> [F]or that six-month period immediately [preceding] filing the petition, which would be August [of] 2020 to February of 2021, [F]ather did not perform any parental duties and evidenced a [settled] purpose of relinquishing his parental claim to the four children. And it went beyond that, it went 11 months back, [to the] September of 2019 last communication[,] according to his testimony. I also heard that perhaps it was February of 2020. Either way[,] it's well beyond the six-month period.

N.T., 9/3/21, at 169.

> In weighing the testimonial evidence, the Orphans' Court opined:

> To suggest that [M]other made him drop out of these visits is ludicrous. The kids are going, he's got six hours to spend with them[,] and on his own without any obstruction or anything on anybody else's behalf, he stopped showing up according to [K.K.] the last couple months, maybe more, he wasn't there.

> What was he doing? I don't know, but he wasn't showing up for visits with his kids.

> [M]other and S[t]epfather weren't interfering with that. It was him making a decision based on all these things he perceived in the background . . . it's not fair to my parents, I can't take [Children] anywhere, it's always . . . the grandparents, not me. So I'm not going to spend time with my kids I guess was his explanation. Utter and complete nonsense.

N.T., 9/3/21, at 166.

Father concedes that he lacked contact with Children during the relevant time-period under Section 2511(a)(1). He justifies his absence by stating that he wanted Children "to spend time with [M]other during the limited time that

she had left, and that he did not want to put [C]hildren through the stress of legal proceedings during this difficult time." Father's Br. at 11. In addition, Father claims that he did not send cards or gifts because he did not have an income, and he was in debt. *Id.*

Father's arguments garner no relief. Father himself testified that he ended his supervised visits with Children in September 2019 because the visits overburdened his parents and because "with my mom and dad, you know, hey, did you do this, you made a mess, this one spilled that. So, it's like I am the nanny so to speak while my older parents are really frantic." N.T. at 109-110. Father also asserted that he stopped the visits because he "was being scrutinized as [he] slept the whole time or, . . .wasn't there, and then it became a thing where instead of me . . . filing for modification, I kind of stepped back because I knew that it was just a vehicle for her to take anger out on me." *Id*., at 109-110. Regarding his lack of phone calls to Children, Father stated that "essentially I gave up[.]" N.T., 9/3/21, at 112, 123. Father also testified that he did not send cards or gifts to Children because he was not in a financial position to do so, and although he tried a couple of times to send things, he stopped trying because he had been met with "resentment, anger, hostilities[, and] stonewalling [from Mother]." *Id*. at 117-119.

Our review of the evidence supports that the Orphans' Court conclusion that Father "demonstrated no firmness with respect to the perceived obstacles laid out by [M]other." Orphans' Court Opinion, 10/5/21, at 16. Rather, as

the court found, Father "took the easy way out at every step. Ceasing his visits at his parents' home, not communicating with [C]hildren, not showing up in court for custody proceedings, not filing his own modification petition. His alternate theories of being compassionate to [M]other due to her terminal illness while she was [allegedly] simultaneously obstructing his contact with [C]hildren is wholly incredible." *Id*.

The record does not corroborate Father's assertion that Mother's "resentment, anger, hostilities" interfered with his ability to co-parent. In fact, K.K. testified that neither Mother nor Stepfather ever spoke badly about Father to Children or tried to prevent them from having contact with him. N.T., 9/3/21, at 80-81. Moreover, Father conceded that, after ending his supervised visitation, he neither defended nor pursued his custody rights again. *Id.* at 111.

We conclude the Orphans' court properly exercised its discretion in finding that Stepfather met his burden of proof with respect to the termination of Father's parental rights under Section 2511(a)(1).

**Termination Pursuant to Section 2511(b)**

With respect to Section 2511(b), Father argues that the Orphans' Court abused its discretion in terminating his parental rights because there was no bonding assessment performed and the court failed to consider the effect of terminating Children's bond with their paternal grandparents. Father's Br. at 11. Father's arguments merit no relief.

With respect to Section 2511(b), courts focus on the effect that terminating the parental bond will have on the child to determine whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). A child's needs and welfare includes "[i]ntangibles such as love, comfort, security, and stability." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The court's analysis necessarily involves review of the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. In addition, the court may consider the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

When evaluating a parental bond, "the court is not required to use expert testimony" and "Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). In cases where there is no evidence of meaningful and extensive contact between a

parent and a child, it is reasonable to infer that no bond exists. ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008).

The Orphans' Court here found that "there is no bond, at least no positive bond" between Father and Children." Orphans' Ct. Op., dated 10/5/21, at 17-18. The court observed that Father "has been missing completely from [C]hildren's lives for [2] years at the time of the hearing," that Children "will not be substantially harmed by the severance of any parental bond," and "any such harm is greatly outweighed by the stability and care that they will receive when they are adopted by [Stepfather]." ***Id***. at 18. The court concluded that "[a]bsent an adoption by [Stepfather], [C]hildren will be without any parental support in their lives. [M]other has passed away. [F]ather has voluntarily abandoned them. [S]tepfather[,] who has become a true father[,] is ready, willing and able to become the legal parent for [C]hildren. This is clearly in [C]hildren's best interests." ***Id***.

The Orphans' Court assessment is supported by the record and we discern no abuse of discretion in the court's conclusion.

With respect to Father's argument that the court erred because there was no bonding analysis, the precedential legal authority, noted above, holds that no bonding analysis is required. ***In re: Z.P.***, ***supra***, at 1121.

Next, although Father asserts the existence of a bond between grandparents and Children, Father does not challenge the court's conclusion that ***he*** has no significant bond with the Children and he makes no attempt to

- 14 -

argue that the evidence shows otherwise.[5]  Moreover, Father does not challenge the court's crediting K.K.'s testimony that Children never talk to her about Father, never ask about him, and that she has not heard them mention Father in the recent past. N.T. at 76.  Father likewise does not challenge the court's observation that in light of the lack of contact between Children and Father over the past two years, "to suggest that [Children,] younger than [K.K.], are going to be damaged by the termination of [F]ather's rights and the severance of whatever bond they have[,] just defies all logic.  . . ."  N.T., 9/3/21, at 174.

With respect to Father's assertion that the court erred in failing to consider the effect on Children of severing their bond with the paternal grandparents by terminating his parental rights, Father fails to provide meaningful discussion with citation to statutory or case authority.  Father's Br. at 11.  Therefore, Father has waived this claim.  ***In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011); Pa.R.A.P. 2119(b).[6]

**Conclusion**

---

[5] Although Grandparents at one time sought to intervene in the custody proceedings to obtain their own visitation rights, they ultimately withdrew their petition because, *inter alia*, the children "had already been taken away from us for well over a year."  N.T., 9/3/21, at 148-49.

[6] Moreover, the court did opine on the Children's bond with their grandparents before concluding that Children will hopefully "connect in the future" with their grandparents. N.T., 9/3/21, at 175.

Our review of the evidence supports the court's findings, and we discern no abuse of discretion in its termination of Father's parental rights pursuant to Section 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/4/2022